UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

**V.G., a child with a disability, individually and by her parent and next friend, J.G., and M.G., a child with a disability, individually and by her parent and next friend, J.G.,**

**Plaintiffs,**

**-v-**                                        **5:06-CV-531 (NAM/GHL)**

**Auburn Enlarged Central School District,**

**Defendant.**

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

APPEARANCES:

The Office of Andrew K. Cuddy
Jason H. Sterne, Esq., of counsel
5888 Main Street
Williamsville, New York 14221
Attorneys for Plaintiffs

The Office of Frank W. Miller
Frank W. Miller, Esq., of counsel
Charles E. Symons, Esq., of counsel
6575 Kirkville Road
East Syracuse, New York 13057
Attorneys for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

Plaintiffs V.G. and M.G., children with disabilities within the meaning of the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401(3)(A), are students in defendant

Auburn Enlarged Central School District ("District").  They and their parent, J.G., bring this

action for attorneys' fees under 20 U.S.C. § 1415(i)(3)(B)(i)(I), which authorizes district courts to

award attorneys' fees to a prevailing party in IDEA proceedings.

In the first cause of action of the complaint (Dkt. No. 1), plaintiffs claim that the parent J.G. initiated an IDEA proceeding on behalf of her daughter V.G.; that through counsel J.G. obtained the relief requested on significant issues in a Consent Decree ordered by the hearing officer; and that therefore J.G. is a prevailing party entitled under IDEA, 20 U.S.C. § 1415(i)(3)(B)(i)(I), to recover costs and attorneys fees for the proceeding and the instant action. The second cause of action asserts the same claims with respect to V.G.'s sister M.G.

Defendant moves (Dkt. No. 6) for summary judgment dismissing the action.  Plaintiffs move (Dkt. No. 7) for an award of attorneys' fees and costs.  The Court denies defendant's motion and grants plaintiffs' motion for attorneys' fees and costs in the total sum of $9,608.30.

## IDEA AND ATTORNEYS' FEES, GENERALLY

The purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]"  20 U.S.C. § 1400(d)(1)(A).  To further this goal, IDEA requires states receiving certain federal funds to "offer parents of a disabled student an array of procedural safeguards designed to help ensure the education of their child."  *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002).  Among the mandated procedures is the opportunity for a parent of a disabled child to present a "complaint" (also known as a "due process complaint"; hereinafter referred to as "DP complaint")[1] to the local educational agency (here, the District).  20 U.S.C. § 1415(b)(6).  The local educational agency must then convene a resolution session with

---

[1] The "complaint" referred to in section 1415(b)(6) is also referred to as a "due process complaint" in section 1415(b)(7)(A) and 34 CFR § 300.507.  The due process complaints in the case at bar are headed, "Demand for Due Process Hearing"; the Court refers to them as "DP complaints."

the parent and members of an Individual Education Plan ("IEP") team, and, if the matter is not resolved to the satisfaction of the parent, must give the parent the opportunity for an "impartial due process hearing" ("IDP hearing").  20 U.S.C. § 1415(f).  In New York State such hearings are conducted by an "impartial hearing officer" ("IHO").  *See* N.Y. Educ. L. § 4404(1).

A district court may in its discretion award attorneys' fees to a "prevailing party" in an IDEA proceeding or action.  20 U.S.C. §1415(i)(3)(B)(i)(I).  At issue in this case is whether plaintiffs are prevailing parties within the meaning of IDEA for the purpose of recovering attorneys' fees, and, if so, the amount of attorneys' fees, if any, they should receive.  As discussed below, the Court finds that plaintiffs are prevailing parties and awards them $9,608.30.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Facts

The facts relevant to the question of whether plaintiffs may recovery attorneys' fees as prevailing parties are set forth below.  They are undisputed unless otherwise noted.  The Court draws them from the complaint, the documentary evidence, and averments in defendant's Statement of Material Facts which are supported by the record and which plaintiffs do not dispute.

On February 11, 2005, J.G. requested that the District provide her daughter V.G., a middle school student, with an IEP pursuant to IDEA.  At that time V.G. was not classified as a student with a disability under IDEA.  She had previously been diagnosed with the disabilities of early onset bi-polar disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and a conduct disorder.  The District's Committee on Special Education ("CSE") met on June 14 and 16, 2005, but did not classify V.G. as having a disability.

On October 21, 2005, plaintiffs' counsel, Andrew K. Cuddy, Esq., sent the District a DP complaint regarding J.G.'s daughter, V.G.  It proposed that the District classify her as a student with a disability; conduct a thorough evaluation; develop an IEP; provide services to address her reading and math delays and deficits; implement an appropriate program; provide counseling; and conduct a functional behavioral assessment to develop a behavioral intervention plan.  Plaintiffs further demanded that the District pay the parent's attorneys' fees and expenses.

M.G., V.G.'s sister, was also a middle school student in the District.  M.G. had already been classified as a student with a learning disability.  On October 24, 2005, Cuddy sent the District a DP complaint regarding M.G., stating that J.G. was not in agreement with the CSE's classification, evaluation, program, or placement decisions regarding M.G.  The DP complaint proposed that the District conduct a thorough evaluation; develop an IEP; provide services to address M.G.'s reading and math delays and deficits; implement an appropriate program; provide services to address her organizational deficits; and ensure that the composition of the 15:1 classes is such that the range of academic achievement of the students is sufficiently similar.  Plaintiffs further demanded that the District pay the parent's attorneys' fees and expenses.

On November 10, 2005, Laura Owen, the District's Director of Special Education, participated in a resolution session regarding both V.G. and M.G. with the parent and Kyle Costello, a law clerk from Cuddy's office.  In an affidavit in support of defendant's motion, Owen states it was her "impression and understanding" that the parties reached a verbal agreement at the resolution session regarding all issues underlying the DP complaints concerning both girls.

Thereafter, Cuddy forwarded to the District a proposed "Settlement Agreement" regarding

V.G.[2]  It included a provision that the District agreed to pay the parents' attorney fees, costs and expenses in an amount not to exceed $5,000.  Susan T. Johns, Esq., the District's attorney, states that Owen advised her that the District did not agree to pay up to $5,000 in attorneys' fees.

The District forwarded to the parent two proposed "Resolution Agreements" reflecting the District's understanding of the agreements reached by the parties at the November 10, 2005 resolution session concerning both girls.  On November 15, 2005, Cuddy rejected the agreements proposed by the District.

On November 29, 2005, Cuddy sent the District a proposed "Consent Decree" for each girl.  Each proposed Consent Decree included a "so-ordered" line for signature by the IHO.  In her affidavit, Owen states: "While there are some differences between the 'resolution agreements' that I prepared and the 'consent decrees' prepared by Mr. Cuddy, those differences are relatively minor and lack practical significance."  She explains in detail the grounds for this conclusion.

According to Johns, she spoke to Cuddy on December 8, 2005, and advised him that the District did not object to the substance of the proposed November 29, 2005 Consent Decrees, but that "the substance of the decrees needed to reflect that the District had already begun to implement its understanding of the resolution agreement and, therefore, would not need to agree to do the same thing again, at a future date."  Accordingly, on January 4, 2006, Johns sent Cuddy revised proposed agreements, each headed "Agreement," which Johns believed "incorporated the substance of Cuddy's proposed consent decrees, but did not include language that had been rendered superfluous due to events that had transpired after the resolution session."  The Agreements did not include signature lines for the IHO.

Cuddy rejected the proposed Agreements, stating in an e-mail on January 4, 2006: "I

---

[2] It is dated November 1, 2005.  Johns states she received it on November 11, 2005.

NEVER indicated that we were entering into agreements with the district.  I indicated that we would agree to enter into consent decrees and resolve the fee issue later.... We're just going to have to go forward with the hearing."

IDP hearings were scheduled to take place at District offices.  M.G.'s hearing was scheduled for January 12, 2006, before IHO Joan Alexander.  V.G.'s case was scheduled for January 17, 2006, before IHO James Walsh.  Owen's affidavit describes what occurred when the parties assembled on January 12, 2006, for M.G.'s hearing as follows:

> Shortly before the hearing was scheduled to start, the IHO went to her car to retrieve something that she had forgotten to bring inside.  While the parties were assembled in the hearing room waiting for the IHO to return ... [Cuddy indicated] that the parties did not need to go through the hearing, if both sides executed the consent decree and the IHO signed it. When the IHO returned from the parking lot, the attorneys advised her that they would be executing a consent decree and there was not going to be any hearing.
>
> After the IHO was advised that there would be no hearing, I showed her to my office, where she waited while the consent decree was prepared and printed. ... The IHO played no part in fashioning the agreement, however, she did return to the hearing room and signed it after the parties had signed it. In addition to entering into the consent decree to resolve the proceeding involving M.G., the parties also executed a consent decree at the same time to resolve the proceeding involving V.G....

(Citations to record omitted.)

The affidavit from the District's attorney, Johns, is similar to Owen's regarding the events of January 12, 2006.  Johns added:

> After the parties signed the consent decree for M.G., the IHO returned to the room and also signed the consent decree.  According to my recollection, immediately after the IHO returned to the hearing room, but before she signed the agreement, Cuddy asked her if she wanted any information regarding the child or the terms of the agreement and she responded, in sum and substance, that both parties were represented by experienced counsel and if we approved of the agreement, then she would sign it.

-6-

The Consent Decree for V.G. was mailed to James Walsh, the IHO assigned to V.G.'s case.  Walsh so-ordered it on January 17, 2006, and returned it to the District with a cover letter stating: "While not so expressed in exact words, I consider the execution of the Consent Decree by [the] Parent to constitute a withdrawal of her Request for Hearing."

The January 17, 2006 Consent Decree concerning V.G. provides that the District will classify her as a student with a learning disability; that the CSE will convene by February 12, 2006, to review the report of Dr. Ronald Schworm, who performed an independent educational evaluation, as well as any other updated testing or reports, and develop an appropriate IEP; that the District will pay for Dr. Schworm's evaluation and will reimburse the parent for transporting the student to and from this evaluation; and that the parties consent to the participation of Cuddy's legal assistant Diane Zambotti as the parent's representative.

The January 12, 2006 Consent Decree concerning M.G. provides that the District will pay for Dr. Schworm's evaluation and will reimburse the parent for transporting the student to and from this evaluation; that the District shall provide her with specialized instruction in specified areas; that the CSE will meet within 30 days to review any evaluative data and/or recommendations and to develop an appropriate IEP; that the parties will employ a homework tracking system; and that the parties consent to Zambotti's direct participation.

### Applicable Law

The Supreme Court has defined the term  "prevailing party" in the context of similar statutory attorney-fee-shifting schemes as "one who has been awarded some relief by the court." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603

(2001).[3]  A party obtaining relief through a judgment on the merits or a court-ordered consent decree can be a prevailing party, because it has achieved a court-ordered alteration in the legal relationship of the parties.  *Id.* at 604.  In contrast, a defendant's voluntary change in conduct lacks the necessary "judicial *imprimatur* on the change" to make a plaintiff a prevailing party, even where the voluntary change affords the plaintiff the relief sought.  *Id.* at 605.

The Second Circuit applied the *Buckhannon* principle to the IDEA fee-shifting scheme in *A.R. ex rel. R.V. v. New York City Dept. of Educ.*, a case involving a number of New York State IDEA administrative proceedings.  407 F.3d 65 (2d Cir. 2005).  The court first concluded that an IHO's decision on the merits in an IDEA proceeding constituted "administrative *imprimatur*" analogous to a judicial determination, because "such an order changes the legal relationship between the parties: Its terms are enforceable, if not by the IHO itself, then by a court[.]"  *Id.* at 76.  The *A.R.* court further held that dispositive administrative orders incorporating the terms of settlements were analogous to the court-ordered consent decree discussed in *Buckhannon*, thus affording the parents prevailing party status.  In this respect, the Second Circuit observed:

> We think that [administrative consent decrees] evidence the same combination of administrative *imprimatur*, change in the legal relationship of the parties, and judicial enforceability that renders the winner on the merits in an IHO decision ... a "prevailing party" under the IDEA and *Buckhannon*.

*Id.* at 77.  Finally, the Second Circuit distinguished such administratively-sanctioned settlements from "purely private" settlements, holding that the latter do not support prevailing party status, and stating: "Had the IHOs done no more than dismiss the cases following settlement, their involvement to that extent would not be enough."  *Id.* at 78; *accord Mr. L. v. Sloan*, 449 F.3d 405,

---

[3] *Buckhannon* addressed fee-shifting provisions in the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3613(c)(2), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12205.

408 (2d Cir. 2006) (holding that the parent was not a prevailing party because the parties'

settlement was neither approved by the hearing officer nor incorporated into the dismissal order).

**Discussion**

Applying these principles here, the Court notes that the cases of both V.G. and M.G.

proceeded to the IDP hearing stage, hearing dates were set, IHOs were assigned, and, in the case

of M.G., the parties appeared for the hearing prepared to proceed.  In both cases, the parties

agreed upon and signed Consent Decrees setting forth their entire agreements, and the IHOs so-

ordered them.  As such, the IHOs' signatures so-ordering the Consent Decrees gave rise to the

combination of administrative *imprimatur*, the change in the legal relationship of the parties

arising from it, and subsequent judicial enforceability, sufficient to render plaintiffs prevailing

parties under IDEA.  *See A.R.*, 407 F.3d at 77.

Defendants argue, however, that the Second Circuit decision in *Torres v. Walker* militates

against affording prevailing-party status to plaintiffs in the instant case.  356 F.3d 238, 245 (2d

Cir. 2004).  In *Torres*, the Second Circuit considered whether a so-ordered stipulation of

dismissal resolving a prisoner civil rights case carried with it a "sufficient judicial *imprimatur*" to

warrant treatment as a monetary judgment subject to the attorneys' fee cap in the Prisoner

Litigation Relief Act ("PLRA"), 42 U.S.C. § 1997e(d)(2).  In holding that it did not, the *Torres*

court noted, among other factors, that "there is nothing in the record indicating that the district

court carefully reviewed the terms of the stipulation – or, for that matter, reviewed it at all before

'so ordering' it."  In a footnote, that court added: "[T]he Court's restrictive language in

*Buckhannon* requires not only the physical incorporation of the settlement in a district court's

order but also some evidence that a district court intended to place its 'judicial *imprimatur*' on the

-9-

settlement." 356 F.3d at 244, n.6. (citation omitted).

In *A.R.*, however, the Second Circuit did not adopt the *Torres* requirement.  Rather, the court expressly declined to decide whether the requirement of evidence of district court's intention to place its judicial *imprimatur* on the settlement, as articulated in *Torres*, was relevant to prevailing-party status under IDEA.  The *A.R.* court stated:

> In a footnoted *dictum* [in *Torres*, 356 F.3d at 244, n.6], we have indicated that *Buckhannon* requires not only the physical incorporation of the settlement in a district court's order but also some evidence that a district court intended to place its judicial imprimatur on the settlement. <u>If that is so, and if the requirement applies to administrative hearings</u>, the requirement is met here.

407 F.3d at 78, n.14 (emphasis added; citations and internal quotes omitted).  This Court does not read either the language in *Buckhannon* or the analysis by the *A.R.* court as requiring it to inquire into how thoroughly the IHOs reviewed the Consent Decrees in the case at bar or what they intended when they signed them.  Rather, the IHO's signature on the so-ordered line of each of these Consent Decrees is sufficient in itself to provide the required administrative *imprimatur*.[4]

Accordingly, the Court finds that defendant has not demonstrated that it is entitled to judgment dismissing the action for attorneys' fees as a matter of law.  Defendant's motion for summary judgment dismissing plaintiffs' complaint for attorneys' fees (Dkt. No. 6) is denied.

## PLAINTIFFS' MOTION

### Applicable Law

The Court turns to consider plaintiffs' motion (Dkt. No. 7) for an award of attorneys' fees.

---

[4] In any event, if evidence of the IHOs' intentions to place their *imprimaturs* on the Consent Decrees is required, such evidence is provided by the following: the agreements are entitled "Consent Decrees"; they set forth in detail the entire agreements of the parties; they finally resolve these IDEA proceedings, which had reached the DP hearing stage; the parties signed them and then presented them to the IHOs to be so-ordered; and the IHOs signed the agreements on the so-ordered lines and returned them to the parties.

As noted, IDEA provides: "In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability[.]"  20 U.S.C. § 1415(i)(3)(B)(i)(I).  With respect to the amount of attorneys' fees, the section provides: "Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished."  20 U.S.C. § 1415(i)(3)(C).  IDEA prohibits the award of attorney's fees to a parent for any legal services performed after receipt of a timely written offer of settlement if such offer is not accepted and the court determines that the relief finally obtained is not more favorable to the parent than was the settlement offer, unless the court finds the parent was substantially justified in rejecting the settlement offer.  20 U.S.C. § 1415(i)(3)(D)(i)(I)-(III); (E).  Finally, IDEA requires the court to reduce the attorneys' fee award if the court finds the parent has unreasonably protracted the final resolution of the controversy, the hourly rate sought by the attorney unreasonably exceeds the applicable prevailing rate, or the time expended is excessive. 20 U.S.C. § 1415(i)(3)(F)(i)-(iii).

### Facts

For the purpose of awarding attorneys' fees, the Court sets forth below in more detail the communications between the parties.  After the November 10, 2005 resolution session, the District's Director of Special Education, Laura Owen, believed that the parties had reached a verbal agreement regarding the DP complaint regarding both girls.  Owen communicated this belief to the District's attorney, Susan T. Johns, Esq.  On November 11, 2005, Johns received from Cuddy a proposed "Settlement Agreement" dated November 1, 2005, which purported to

reflect the verbal agreement at the resolution session regarding V.G.[5]  It states that the District

will classify V.G. as a student with a learning disability, will develop an appropriate IEP, and will

conduct further evaluation of V.G.  The final two paragraphs are as follows:

> The District agrees to pay the Parents' attorney fees, costs and expenses to
> the Law Office of Andrew K. Cuddy in an amount not to exceed $5,000.00
> within thirty days of the Parent's attorney submitting an itemization of
> same to the District's attorney. These fees will include the costs of the
> Parent's attorney's legal assistant communicating with a representative of
> the District in regards to the C.S.E. meeting referenced herein, traveling to
> and from the herein referenced C.S.E. meeting, and participating in the
> herein referenced C.S.E. meeting to assist the parent.
>
> Upon receipt of payment of the Parent's attorney fees, costs and expenses
> as expressed in paragraph 5, the Parent agrees to withdraw the hearing
> request dated October ___, 2005.

(Paragraph numbering omitted.)  Johns states that Owen advised her that the District had not

agreed to pay "up to $5,000 for the Plaintiff's attorneys' fees, costs and expenses."

Owen then drafted and sent to the parent Resolution Agreements reflecting what she

believed to be the parties' verbal agreements at the November 10, 2005 resolution session.  It is

undisputed that these agreements constitute timely written offers of settlement for purposes of

determining whether the relief finally obtained was more favorable than the settlement offer so as

to avoid the prohibition on recovery of attorneys' fees.  20 U.S.C. § 1415(i)(3)(D)(i)(I)-(III); (E).

The District's proposed Resolution Agreement regarding V.G. states:

> •  The District will classify V. as a student with a disability.  The
> District will conduct additional assessments in the area of reading,
> mathematics, speech and language, and occupation therapy, and
> will consider that information, along with prior assessments, to
> determine which classification most clearly defines V.'s disability.
> Classifications of Emotionally Disturbed and Learning Disabled
> have been suggested.

---

[5] The record does not indicate whether Cuddy forwarded a similar proposed settlement agreement regarding
M.G. at that time.

- The District will convene on or before December 2, 2005, to consider the above information, determine appropriate classification of educational disability and develop an appropriate Individualized Education Plan.  Special education services to be provided will be determined through consideration of the above information, with the Parent as full partner.
- The District will assume fiscal responsibility for an Independent Educational Evaluation.  Parent will schedule an appointment, and provide District contact information to the evaluator, so that they may request from the District a letter documenting this responsibility.
- The district agrees to pay the Parent's reasonable attorney fees within 30 days of the Parent's attorney submitting an itemization to the District.  Payment is to cover only those fees incurred after the date of the impartial hearing demand and prior to the resolution meeting of 11/10/05.

The parent and the District will notify the Impartial Hearing Officer upon expiration of three business days after full execution of this Agreement that the Due Process Complaint was resolved at the Resolution Session and that the hearing request is withdrawn.

The District's proposed Resolution Agreement regarding M.G. states:

- The District will assume fiscal responsibility for an Independent Educational Evaluation of M. by Dr. Ronald Schworm.   Parent will schedule an appointment, and provide District contact information to the evaluator, so that they may request from the District a letter documenting this responsibility.  The District's CSE will convene upon receipt of the completed evaluation report to consider whether there should be any changes to M.'s IEP.
- The district will schedule a CSE meeting, upon parent request, to consider changes to M.'s current program.  After review of the current program, it was determined that M. is receiving specialized instruction in both reading and math.  If the parent determines that the inclusive model currently being provided to M. does not meet her needs, she can request a program review to consider a more restrictive model.  This model is not available at M's current school, so a transfer to the district's other middle school would be necessary to implement this change.
- The district agrees to pay the Parent's reasonable attorney fees within 30 days of the Parent's attorney submitting an itemization to the District.  Payment is to cover only those fees incurred after the date of the impartial hearing demand and prior to the resolution meeting of 11/10/05.

-13-

The parent and the District will notify the Impartial Hearing Officer upon expiration of three business days after full execution of this Agreement that the Due Process Complaint was resolved at the Resolution Session and that the hearing request is withdrawn.

By e-mails dated November 15, 2005, Cuddy rejected the Resolution Agreements proposed by the District.  Cuddy made no specific objections or requests.  Cuddy's e-mail with respect to V.G. stated:  "As you know, the resolution session between the parent and the district did not result in a written settlement agreement.  Although the parent received something today that attempted to reflect discussions at the meeting, it did not.  As such, it is rejected."  Cuddy then referred to the settlement proposal he had sent to the district regarding V.G. (presumably the one dated November 1, 2005), which would be "on the table" for three days, after which it would be withdrawn, and the parties would proceed with the IDP hearing.  Cuddy's e-mail regarding M.G. was similar.

On November 29, 2005, Cuddy sent the District proposed "Consent Decrees" for V.G. and M.G.  With respect to these documents, Owen's affidavit states:

> While there are some differences between the "resolution agreements" that I prepared and the "consent decrees" prepared by Mr. Cuddy, those differences are relatively minor and lack practical significance.  For example, my proposed resolution agreement for M.G. did not reference a "homework tracking system" and did not note that the IEP would contain appropriate measurable goals and objectives. However, I do not consider this a substantive or meaningful difference because all IEPs are supposed to have appropriate measurable goals and objectives, and because the District uses a homework tracking system for all students, and, upon parental request, such as was the case here, additional verification and monitoring procedures are used.  Those additional procedures were already being used for M.G. Based on my belief that there was nothing in the proposed consent decree that was either not provided in my resolution agreement for M.G. and/or already provided, I viewed the consent decree sent on November 29, 2005 as acceptable, and communicated this belief to the District's attorney, Susan Johns.

-14-

As to the proposed consent decree for V.G., I thought that there was also little substantive difference between that proposal and my settlement agreement. For example, both provided for V.G. to be classified as disabled, both set a December, 2005 deadline for the development of an IEP and both provided for an independent educational evaluation at the District's expense. In addition, a committee on special education ("CSE") meeting had been convened for V.G. on December 8, 2005 and the CSE recommended an IEP at that time, which included a classification of "learning disabled" for V.G., as well as the provision of resource room services, speech and language consult, program modifications and testing accommodations. Paragraph number "4" of the consent decree does include language regarding evaluations that was not included in my resolution agreement, however, that difference is of no consequence as the evaluations referenced in paragraph number "4" had already been completed by the time the consent decree was sent by Mr. Cuddy on November 29, 2005. One aspect of Mr. Cuddy's proposed consent decree that I did find objectionable was language in paragraph number "1" where it stated that the District would classify V.G. as emotionally disturbed. I thought it was more appropriate to agree that classification as disabled was appropriate, rather than the specific "emotional disturbance" classification. It should be noted that the consent decree ultimately executed for V.G. did not include the "emotional disturbance" language. Due to my general agreement with the substance of the consent decree for V.G., I advised attorney Susan Johns that the substance of the consent decree was generally acceptable to the District.

Johns' affidavit states that she spoke to Cuddy on December 8, 2005, and advised him that the District did not object to the substance of the proposed November 29, 2005 Consent Decrees, but that "the substance of the decrees needed to reflect that the District had already begun to implement its understanding of the resolution agreement and, therefore, would not need to agree to do the same thing again, at a future date." Cuddy's entry on his attorney fee bill states with respect to December 8, 2005: "Converse with STJ [Susan T. Johns] at another hearing, consent decree acceptable to district, email STJ re: same."

On January 4, 2006, Johns e-mailed Cuddy revised agreements. They are headed "Agreement" and contain signature lines for J.G. and Laura Owen. Johns' accompanying correspondence states:

Andy, attached are revised agreements for the G. girls.  As of this date, Ron Schworm has conducted his evals and forwarded reports of same to the District.  The CSE can meet any time next week with the exception of Mon morning provided that the parent waives the 5 day notice for at least some of those days.  I think everything discussed in your versions of the agreement is done with the exception of the CSE meeting.  Let me know.

I'm going to take the liberty of emailing Joan Alexander to give her a heads up that there is a good chance that the M. hearing may not happen next week.

According to her affidavit, Johns thought the revised agreement "incorporated the substance of Cuddy's proposed consent decrees, but did not include language that had been rendered superfluous due to events that had transpired after the resolution session."

Cuddy rejected the proposed Agreements regarding both girls, stating in an e-mail on the same day:

I NEVER indicated that we were entering into agreements with the district. I indicated that we would agree to enter into consent decrees and resolve the fee issue later.... We're just going to have to go forward with the hearing.  You were well aware that these new proposals were NOT consent decrees, you were aware that they would be unacceptable, you were aware that you were wasting your time and your client's resources.  Don't waste any more of my time and just shoot me your disclosure.  I will inform IHO Alexander that we anticipate going forward.

Johns responded to Cuddy's e-mail the same day, stating: "Andy, the District has done all that the parent wants.  Call it what you want.  The point is that there is no issue in dispute."

Cuddy responded the same day by e-mail stating:

What the district has done is denied these two children a FAPE [Free Appropriate Public Education, required by IDEA], and then expected the parent to incur considerable expense and aggravation in trying to get a FAPE for her children.  You can argue your case to the hearing officer.... See you at the hearing.

On January 6, 2006, Johns sent Cuddy a lengthy e-mail stating her belief that all disputed issues had been resolved.  Johns set forth each item proposed by plaintiffs in the October 21 and

-16-

24, 2005 DP complaints and explained in detail the District's responses to plaintiffs' requests,

including the evaluations by Dr. Schworm.  Johns concluded:

> The substantive demands made by your client have been met and/or the
> District is willing to meet them but requires your client's participation to
> do the same.  Nevertheless, you indicated by e-mail dated January 4, 2006
> that we are wasting your time and that you will inform the hearing officer
> that the hearing is going forward. By e-mail of that same date, you did so.
> It is not known what additional substantive relief your client seeks.
> ...
> Again, I believe that there is no substantive issue in dispute. ... Please let
> me know if you reconsider your position.

On January 8, 2006, Cuddy responded:

> ...At this time, the district does not have an appropriate IEP in place for
> either of the G. children, and the work of my office does not conclude until
> those goals are accomplished. ... We have been unable to achieve such a
> settlement, partly due to your client's position that my client bear all of her
> attorney fees and costs that she incurred as a result of your clients
> deprivation of a FAPE to her two children. ... Of course, this is not the only
> reason that the district's proposals have been rejected, but we can get into
> that in future litigation which you[r] letter implies is likely to occur.
> ...
> Your letter also suggests that a parent may not recover fees associated with
> CSE meetings as a result of a settlement agreement. Certainly, if that
> provision is in a settlement agreement, then the parent can recover the fees,
> which is a simple application of contract principles. Furthermore, should a
> parent go forward with a hearing and prevail, as I strongly believe we will
> in both matters, the parent is entitled to recovery of fees for the resulting
> CSE meeting.
> ...
> Obviously, the Schworm evaluation issue is not fully resolved. Your
> client's representation of payment for the evaluation seems not to have
> been committed to in any enforceable agreement with my client as your
> letter indicates.
> ...
> You even indicate that the program issues are still in debate in your own
> letter, in the last paragraph of page 2, which states "If appropriate, the IEP
> will be revised accordingly." This admission on your part is further
> evidence that the substantive issues regarding program have yet to be
> resolved.

On January 12, 2006, the date scheduled for the IDP hearing in front of IHO Joan

-17-

Alexander concerning M.G., the parties assembled at the District offices.  Owen's affidavit

describing what occurred has been quoted above in connection with defendant's motion.  It is

quoted here in more detail:

> The hearing was scheduled to take place in the District's administrative
> offices. On January 12, 2006, the parties and their attorneys arrived for the
> hearing, as did the IHO. Shortly before the hearing was scheduled to start,
> the IHO went to her car to retrieve something that she had forgotten to
> bring inside. While the parties were assembled in the hearing room waiting
> for the IHO to return, Susan Johns asked attorney Cuddy, in sum and
> substance, "why are we here? There is nothing to litigate." Attorney Cuddy
> responded by indicating that the parties did not need to go through the
> hearing, if both sides executed the consent decree and the IHO signed it.
> When the IHO returned from the parking lot, the attorneys advised her that
> they would be executing a consent decree and there was not going to be
> any hearing.
>
> After the IHO was advised that there would be no hearing, I showed her to
> my office, where she waited while the consent decree was prepared and
> printed. It is my recollection that there was basically no negotiation
> regarding the substance of the consent decree and that attorney Cuddy
> simply prepared it and then I signed it.  The IHO played no part in
> fashioning the agreement, however, she did return to the hearing room and
> signed it after the parties had signed it. In addition to entering into the
> consent decree to resolve the proceeding involving M.G., the parties also
> executed a consent decree at the same time to resolve the proceeding
> involving V.G.  As with the other consent decree, there was no negotiation,
> attorney Cuddy simply prepared the document and I signed it on behalf of
> the District.  While the parties signed the consent decree for the V.G.
> proceeding on January 12, 2006, the IHO assigned to that case, James
> Walsh, signed it on January 17, 2006, after it was mailed to him.

(Citations to record omitted.)

The January 12, 2006 "Consent Decree" concerning V.G. states:

> The parties agree as follows:
> 1. The District will continue the classification of the Student as a student
> with a learning disability pursuant to the Regulations of the Commissioner
> of Education Part 200 and the Individuals with Disabilities Education Act.
> 2. The District's Committee on Special Education (hereinafter the "C.S.E.")
> will convene by February 12, 2006 to review Dr. Schworm's report and
> any other updated testing or reports and develop an appropriate

Individualized Education Plan (hereinafter an "I.E.P.") to meet the special education needs of the Student in light of those reports.

3. The District has granted the parent an independent educational evaluation of the Student by Dr. Ronald Schworm, at district expense to assess the student's specific deficits and abilities. The district will ensure that payment is made for this evaluation, if it has not already done so. The District will reimburse the Parent for transporting the Student to and from this evaluation at the current rate per mile.

4. The District's C.S.E. will convene at a mutually agreeable time prior to February 12, 2006 to implement this consent decree.

5. The District consents to the Parent's attorney's legal assistant Diane Zambotti communicating with a representative of the District in regards to the C.S.E. meeting referenced herein to discuss issues relevant to the meeting, in order to facilitate an efficient C.S.E. meeting, and to the participation of Ms. Zambotti in this C.S.E. meeting.

On January 17, 2006, IHO Walsh so-ordered the document regarding V.G.  In his cover letter forwarding the fully executed consent decree, IHO Walsh wrote: "While not so expressed in exact words, I consider the execution of the Consent Decree by [the] Parent to constitute a withdrawal of her Request for Hearing."

The January 12, 2006 "Consent Decree" concerning M.G. states:

The parties agree:

1. The District has granted the Parent an Independent Educational Evaluation of the Student by Dr. Ronald Schworm, at District expense to assess the Student's specific deficits and abilities. The District will ensure timely payment to the independent evaluator is made, if that payment has not already been made. The District will reimburse the Parent for transporting the Student to and from this evaluation at the current rate of $[illegible] per mile. The CSE will convene to discuss any recommendations that stem from this evaluation and, if appropriate implement the recommendations into the Student's IEP.

2. The District shall provide the Student with specialized instruction in the areas of mathematics, reading and writing. The CSE shall convene to discuss the specific areas of deficit for the Student and develop an appropriate program to address these needs. Goals and short-term objectives will be developed to address the Student's reading comprehension deficits. A description, duration and frequency of this programming will be indicated on the IEP.

-19-

3. The District shall ensure that the CSE, with the Parent as an equal member, will meet within 30 days of this Consent Decree to review any evaluative data and/or reported recommendations, to develop an appropriate IEP that contains accurate present levels of performance and appropriate, measurable goals and objectives.

4. The parties will employ a homework tracking system to be implemented by the district staff and the parent to ensure the student's assignments are completed and turned-in in a timely [manner].

5. The parties consents to direct communication from Diane Zambotti, legal assistant of Mr. Cuddy, with the C.S.E. chairperson prior to the herein referenced C.S.E. meeting to discuss the evaluations, present levels of performance, goals and objectives, placement and other C.S.E. issues in order to facilitate an efficient C.S.E. meeting.

## Discussion

In addressing plaintiffs' motion for attorneys' fees, the Court first observes that "parties are ordinarily required to bear their own attorney's fees ... absent explicit statutory authority" to seek such fees from the losing party. *Buckhannon*, 532 U.S. at 602 (internal quotation marks and citations omitted). Thus, the Court looks to the relevant text of IDEA, which provides: "In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs ... to a prevailing party who is the parent of a child with a disability[.]" 20 U.S.C. § 1415(i)(3)(B)(i)(I). The phrase "brought under this section" refers to actions and proceedings brought under section 1415. *Vultaggio v. Board of Educ., Smithtown Cent. Sch. Dist.*, 343 F.3d 598, 602 (2d Cir. 2003).

The Court has already found that plaintiffs are prevailing parties. The Court does not agree with defendant that the Court should exercise its discretion to deny attorneys' fees entirely.[6]

---

[6] The Court is aware that the outcome in this case appears to reward plaintiffs and their counsel for not settling the matters until the IDP hearing stage, at which point IHOs were available to sign the settlements as "Consent Orders," thus supporting attorneys' fee awards. This, however, is the state of the law as the Court reads it. The Court does not find that plaintiffs or their counsel acted improperly or in bad faith, nor does the Court perceive any other basis to exercise its discretion to deny their attorneys' fee applications in their entirety.

Defendant also argues that plaintiffs may not properly be reimbursed for attorneys' services rendered during certain time periods; the Court now addresses these arguments.

Defendant contends that section 1415 authorizes reimbursement only for attorneys' time spent after the proceedings were commenced by delivery to the District of the DP complaints.[7] Therefore, defendant argues, plaintiffs cannot recover for attorney time spent preparing those complaints.  Defendant cites *Shanahan v. Board of Educ.*, 953 Fed.Supp. 440, 444 (N.D.N.Y. 1997) ("The 'trigger point' for attorney's fees under the IDEA is generally a request for an impartial hearing.").  The Court finds no support for this argument in the statute, which authorizes an attorneys' fee award "in any ... proceeding[.]"[8]  20 U.S.C. § 1415(i)(3)(B)(i)(I); *see also* 34 C.F.R. § 300.517.  A proceeding is commenced by delivery of a DP complaint, *see Vultaggio*, 343 F.3d at 602 (the DP hearing demand "triggers the availability of an impartial due process hearing and the attendant procedural safeguards attach"), and in this sense delivery of the DP complaint is the "trigger point" for attorneys' fees; if no DP complaint is delivered, there is no proceeding in which an award can be made.  Where, however, a proceeding has been commenced and other requirements have been met, the Court may exercise its discretion to award attorneys' fees for services connected with the proceeding, regardless of whether they were rendered before or after delivery of the DP complaint.  Here, where previous efforts to resolve V.G's and M.G.'s educational issues to the parent's satisfaction were unsuccessful, there is no basis to deny

---

[7] As noted previously, the "DP complaint" referred to in this Memorandum-Decision and Order is the same as the "complaint" referenced in section 1415(b)(6); the "due process complaint" referenced in section 1415(b)(7)(A) and 34 CFR § 300.507; the "request for an impartial hearing" referenced in *Shanahan v. Board of Educ.*, 953 Fed.Supp. 440, 444 (N.D.N.Y. 1997), and *F.R. v. Board of Educ., Plainedge Public Schools*, 67 Fed.Supp.2d 142, 148 (E.D.N.Y. 1999); and the "Demand for Due Process Hearing" served by plaintiffs in each case at bar.

[8] The only express prohibitions are for time spent after certain settlement offers and for IEP meetings unless they resulted from the proceeding.  20 U.S.C. § 1415(i)(3)(D)(i),(ii); *see also* 34 C.F.R. § 300.517.

reimbursement for their attorneys' time spent preparing the DP complaints that commenced the

proceedings. *See F.R. v. Board of Educ., Plainedge Public Schools*, 67 Fed.Supp.2d 142, 148

(E.D.N.Y. 1999) (expense of attorney work performed in preparation of requests for impartial

hearings is "clearly reimbursable under the IDEA.").

Defendant also argues that attorneys' fees are precluded for all services rendered on and

after November 15, 2006, when plaintiffs rejected the District's proposed Settlement Agreements

stemming from the November 10, 2005 resolution session.  Defendant relies on section

1415(D)(i) which prohibits attorneys' fees for services performed subsequent to a timely written

offer of settlement where the court finds that "the relief finally obtained by the parents is not more

favorable to the parent than the offer of settlement."  Plaintiffs' Memorandum of Law argues that

they ultimately obtained the following relief in addition to the relief offered by the District:

> The offer made regarding M.G. clearly provides less relief than that
> obtained via consent decree. In particular, the district's offer does not
> include a homework tracking system, which was to address M.G.'s
> organizational deficits. Also, the offer does not provide for mileage
> reimbursement for the parent to transport M.G. to Dr. Schworm (in
> Rochester).[9]
>
> While the relief obtained for V.G. was closer to the settlement offer, the
> consent decree did provide the parent with mileage reimbursement, which
> is slightly more than offered in the resolution agreement. Also, the consent
> decree is more specific about the child's classification, guaranteeing her a
> learning-disabled classification; the offer does not specify, leaving the
> classification up to the CSE.

Moreover, the District's offers were not specific in certain respects, and, as the parties'

negotiations progressed, the District provided the girls with some of the requested services, so

that it is not possible to compare the offers directly with the Consent Decrees in some aspects.  It

---

[9] Defendants do not dispute plaintiffs' contention that the round trip from Auburn to Rochester is 130 miles
and that J.G. had to make the trip twice, once for each girl.

cannot be said as a matter of law that the relief plaintiffs finally obtained was "not more favorable" to them than the settlement offers so as to preclude reimbursement for any attorneys' fees incurred on and after November 15, 2008 pursuant to section 1415(D)(i).

The Court finds, however, that plaintiffs should be reimbursed for only a portion of the attorneys' fees incurred during this time period.  Cuddy achieved relatively little after November 15, 2006, except to secure a claim to attorneys' fees against the District by obtaining a Consent Decree signed by the IHO instead of a Settlement Agreement signed only by the parties. Although the Court has found that plaintiffs did obtain some degree of relief in addition to the relief offered by the District, the relatively minor changes and adjustments did not warrant the amount of time expended, particularly because the District made genuine efforts to accommodate plaintiffs' requests during this time.  Accordingly, plaintiffs are entitled to reimbursement for only 20% of the hours spent by Cuddy and Zambotti on and after November 15, 2006.

The Court now considers the appropriate fee to be awarded in light of the factors enumerated by IDEA and the general principles applicable to attorneys' fee awards.

As for the hourly amounts, plaintiffs request $210 per hour for attorneys Cuddy and Jason H. Sterne, Esq. and $80 per hour for Diane Zambotti and Kyle Costello.  Plaintiffs point out that in *J.S. v. Crown Point Cent. Sch. Dist.*, 2007 WL 475418 (N.D.N.Y. Feb. 9, 2007), Senior District Judge Frederick J. Scullin, Jr. awarded the same rates to the same attorneys and paralegals for work on the same type of case.  Affidavits show that Cuddy and Sterne were admitted to practice in 1996 and that both have substantial experience in administrative and court proceedings, particularly in IDEA cases.  Affidavits further show that Zambotti, a paralegal, has been working as a legal assistant in Cuddy's law firm in 2002, has attended "hundreds of CSE meetings on behalf of parents," and has "reviewed and compiled all documents associated with hearings and

-23-

worked directly with clients as to all aspects of the hearing process in over a hundred cases."
Costello's affidavit shows that he attended SUNY Buffalo School of Law beginning in 2002,
worked in the Special Education Law Clinic while in law school, graduated *cum laude* in 2005,
and thereafter worked in private practice advocating for disabled children.  Defendant does not
dispute that these rates reflect the presumptively reasonable fee that a reasonable, paying client
would have paid for the services rendered by these people.  Nor does defendant dispute that these
are prevailing rates in the community for the kind and quality of services furnished.  Based on the
parties' submissions, the rates awarded in prior cases, and the Court's familiarity with the
prevailing rates in the community, the Court holds that plaintiffs are entitled to recover $210 per
hour for Cuddy's and Stern's time and $80 per hour for Zambotti's and Costello's time.

Considering first the case of V.G., the Court notes that on February 11, 2005, J.G.
requested the District to provide V.G. with an IEP; that at that time V.G. was not classified as a
student with a disability under IDEA although she had previously been diagnosed with early
onset bi-polar disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and
a conduct disorder; and that the CSE met on June 14 and 16, 2005, but did not classify V.G. as
having a disability.  The attorneys' fee submissions by Cuddy show that J.G first contacted him
by e-mail regarding V.G. on September 1, 2005; that thereafter he obtained V.G.'s records; and
that he and his legal assistant Diane Zambotti reviewed the records, drafted the DP complaint, and
communicated with the client on a number of occasions in preparing the DP complaint, which
they sent to the District on October 21, 2005.  Cuddy documents 5.3 hours spent preparing V.G.'s
DP complaint through October 21, 2005.  The time spent is adequately documented and the
number of hours claimed by Cuddy regarding V.G. through October 21, 2005 is reasonable under
all the circumstances.

After the DP complaint on October 21, 2005, until November 15, 2005, the date he rejected the District's proposed Settlement Agreement, Cuddy spent 4.3 hours on V.G.'s case. These hours, spent preparing for the November 10, 2005 resolution session and then conferring with his staff and J.G. regarding possible settlement, are adequately documented and reasonable.

From November 15, 2005, when he rejected the District's proposed Settlement Agreement, through January 24, 2006, after the IHO signed the Consent Decree, Cuddy spent 7.5 hours on V.G.'s case, primarily communicating with J.G., the IHO, and the District.  The Court has already held that 20% of the hours spent by Cuddy during this time should be reimbursed, *i.e.*, 1.5 hours.

Accordingly, the total reimbursable time spent by Cuddy on V.G.'s case is 11.1 hours.   At a rate of $210 per hour, plaintiffs are entitled to recover $2,331 for Cuddy's services for V.G.

Zambotti spent 9.9 hours on V.G.'s case prior to Cuddy's rejection of the District's proposed Settlement Agreement.  She spent over half of this time on November 2, 2005, preparing the disclosure, exhibit list, and cover letter regarding V.G.  After the rejection of the proposed Settlement Agreement she spent 0.2 hours; 20% of this is a negligible amount which will not be counted.  Zambotti's time is adequately documented and reasonable under the circumstances.  At a rate of $80 per hour, plaintiffs are awarded $792 for Zambotti's time for V.G.

Costello spent 0.3 hours with Cuddy to discuss settlement strategy on November 9, 2005, appeared at the November 10, 2005 resolution meeting with J.G. (for which no charge was made), and spent a total of 0.7 hours reviewing settlement terms thereafter.  The time claimed for Costello regarding V.G. during this period is adequately documented and is reasonable under all the circumstances.  Plaintiffs are awarded $80 for Costello's services for V.G.

Thus, the fee award for V.G. for Cuddy, Costello, and Zambotti is $3,203, plus $222 in costs, for a total of $3,425.

With respect to M.G.'s case, Cuddy's attorneys' fee submissions show that J.G first contacted him by e-mail regarding M.G. on September 24, 2005; that thereafter Cuddy reviewed records, met with J.G., and worked with Zambotti drafting the DP complaint, which they sent to the District on October 24, 2005.  Cuddy documents 5.2 hours preparing M.G.'s DP complaint through October 24, 2005.  The time spent is adequately documented and the number of hours claimed by Cuddy regarding M.G. through October 24, 2005 is reasonable under all the circumstances.

After the DP complaint on October 24, 2005, until November 15, 2005, the date he rejected the District's proposed Settlement Agreement, Cuddy spent 2.9 hours on M.G.'s case.  These hours, spent preparing for the November 10, 2005 resolution session and then conferring with J.G. and Costello regarding possible settlement, are adequately documented and reasonable.

From November 15, 2005, when he rejected the District's proposed Settlement Agreement, until January 24, 2006, after the IHO signed the Consent Decree, Cuddy spent 7.8 hours, primarily communicating with J.G., the IHO, and the District.  The Court has already held that 20% of the hours spent by Cuddy during this time should be reimbursed, *i.e.*, 1.6 hours.

Accordingly, the total reimbursable time spent by Cuddy on M.G.'s case is 9.7 hours.  At $210 per hour, plaintiffs are awarded $2,037 for Cuddy's services for M.G.

Zambotti spent 5.5 hours on M.G.'s case prior to Cuddy's rejection of the District's proposed Settlement Agreement.  She spent much of the time preparing the disclosure, exhibit list, and cover letter regarding M.G. on November 3, 2005.  She spent 0.4 hours after Cuddy's rejection of the District's proposed Settlement Agreement; of this time, plaintiffs are entitled to

recover 0.1. Zambotti's time is adequately documented and reasonable under the circumstances. Plaintiffs can recover fees for 5.6 hours of Zambotti's time regarding M.G; at $80 per hour, this totals $448.

Costello appeared at the November 10, 2005 resolution meeting with the parent, and spent a total of 1.1 hours on M.G.'s case, all prior to Cuddy's rejection of the District's proposed Settlement Agreement. The time claimed for Costello regarding M.G. is adequately documented and is reasonable under all the circumstances. Plaintiffs are awarded $88 for Costello's services for M.G.

Thus, the fee award for M.G. for Cuddy, Costello, and Zambotti is $2,573, plus $160.30 costs, for a total of $2,733.30.

Finally, plaintiffs seek attorneys' fees for the services of Jason H. Sterne, Esq. Stern spent one hour on January 11, 2006 in preparation for M.G.'s hearing, which should be reimbursed at 20%; at a rate of $210 this totals $42. Plaintiffs also seek to recover for 15.8 hours from May 2, 2006 until March 16, 2007, which Stern spent in pursuing the instant lawsuit for attorneys' fees for both V.G. and M.G. It is true, as defendant points out, that Sterne does not itemize some of his activities with as much detail as is desirable, in particular his entry for 7.4 hours on March 16, 2007, which states: "Respond to motion and draft cross-motion." However, the Court has before it plaintiffs' submissions on the motion, and has no difficulty concluding that this is a reasonable amount of time. Plaintiffs are awarded fees for Stern's services at $210 per hour for 15.8 hours, or $3,318, plus $42 for a total of $3,360.

The total fee award is $9,518.30, plus $90 for service of process, for a grand total of $9,608.30.

## CONCLUSION

It is therefore

ORDERED that defendant's motion (Dkt. No. 6) for summary judgment dismissing the action is denied; and it is further

ORDERED that plaintiffs' motion (Dkt. No. 7) for an award of attorneys' fees and costs is granted in the amount of $9,608.30.

IT IS SO ORDERED.

December 9, 2008
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

-28-